IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
July 19, 2019 Session

## IN RE KHLOE B. ET AL.

**Appeal from the Chancery Court for Washington County**
**No. 18-AD-0043      John C. Rambo, Chancellor**

_____

**No. E2018-02265-COA-R3-PT**
_____

        Kristin B. ("Mother") appeals the judgment of the Washington County Chancery Court ("Trial Court") terminating her parental rights to the children, Khloe B. and Madison B. ("the Children"). Upon petition of Matthew B. ("Father") and Amanda B. ("Stepmother") (collectively, "Petitioners"), the Trial Court found that Mother had abandoned the Children by her actions exhibiting wanton disregard for the Children's welfare and that termination of Mother's parental rights was in the Children's best interest. The Trial Court, therefore, terminated Mother's parental rights to the Children. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

Michelle Caggiano, Johnson City, Tennessee, for the appellant, Kristin B.[1]

Rachel Ratliff, Johnson City, Tennessee, for the appellees, Matthew B. and Amanda B.

---

[1] We recognize that Mother's name is listed as both "Kristen" and "Kristin" throughout the record. Based upon Mother's signature on her affidavit of indigency, we believe her name to be "Kristin" and will refer to her as such for purposes of this Opinion.

## OPINION

## Background

This action commenced on January 26, 2018 when Petitioners filed a petition with the Trial Court seeking to terminate the parental rights of Mother to the Children. In their petition to terminate Mother's parental rights, Petitioners allege as grounds that Mother abandoned the Children by failing to visit or financially support the Children during the four months prior to the petition's filing and that Mother had failed to manifest an ability and willingness to assume custody or financial responsibility for the Children. Petitioners further allege that termination of Mother's parental rights is in the Children's best interest.

In January 2018, a notice to incarcerated parent was filed with the Trial Court reflecting a certificate of service to Mother at the Washington County Detention Center in Jonesborough, Tennessee. Upon Mother's request, an attorney was appointed to represent her in this matter. Mother subsequently filed an answer in March 2018, denying both that statutory grounds existed to terminate Mother's parental rights and that termination was in the Children's best interest.

A trial was conducted on September 4 and 18, 2018. At the beginning of trial during opening statements, Mother's attorney stated: "We've prepared to proceed in regards to the Wanton Disregard because mother was incarcerated, she would stipulate to the fact that she was incarcerated in October of 2017." Later during the trial, Mother's attorney informed the Trial Court that Mother was not objecting to wanton disregard being tried as a ground for the termination of Mother's parental rights.

During trial, Pamela Hensley, Khloe's kindergarten teacher, testified that Stepmother was present during most field trips. According to Ms. Hensley, Stepmother was "very active volunteering in [her] classroom and coming on field trips." Ms. Hensley testified Mother did not attend any of the field trips that parents were allowed to attend, and she never saw Mother at the school for anything. Ms. Hensley further testified that Mother had emailed her one time in late September 2015 but she could not respond due to a court order at the time. Ms. Hensley explained that the administration in the principal's office had informed her that Mother had no legal right to receive information from the school regarding the child. According to Ms. Hensley, Mother never attended any parent-teacher conferences during Khloe's kindergarten year.

Amanda Baker, Khloe's pre-kindergarten teacher, testified that she was familiar with Father and Stepmother but that she only saw Mother twice at school during the time Khloe was in her class. Ms. Baker clarified that Mother had come with Father through the "car rider drop off line" with Father on two mornings toward the beginning of the year. Ms. Baker testified that Mother had not attended any events that the parents were

allowed to attend, but Stepmother attended these events after she became involved with Father. Ms. Baker testified that she also taught Madison in pre-kindergarten from August 2016 to May 2017.

Father testified that he and Mother were married from March 2012 until December 2014. According to Father, when Madison was born, she had to stay in the Neonatal Intensive Care Unit because she was born with drugs in her system and had to be placed on morphine to wean her off the drugs. Father explained that Madison remained in the hospital for three weeks before she was discharged into the care of Mother and Father.

According to Father's testimony, Mother and Father began having problems in their marriage after Madison was born. Father explained that he knew Mother had used drugs in the past but was unaware she was still using them. Father testified that Mother had gone to Woodridge several times, once or twice before Madison was born and a couple times after Madison was born. Father stated that Mother also attended a month program at Willow Ridge and programs at Magnolia Ridge and Frontier Health. Father testified that prior to Madison's birth, he observed Mother using narcotics and that he tried to get her help by sending her to Woodridge and Frontier Health. Father further testified that months after Madison was born, Mother would go stay at her uncle's home for periods of time extending from a week through a month at a time before returning home.

Father testified concerning Mother's criminal activity and presented court, probation, and jail records to the Trial Court. The court records reflect that in April 2013, Mother pled guilty to a charge of theft under $500 and was placed on supervised probation. Mother was subsequently arrested in August 2013 for aggravated assault against Father's sister. On the basis of the aggravated assault charge, Mother was charged with a violation of her probation stemming from the theft charge. In October 2013, Mother pled guilty to a violation of probation and was sentenced to time served. Court records reflect that Mother ultimately pled guilty to the aggravated assault charge in September 2014 and received a sentence of three years supervised probation.

In April 2014, Mother was arrested and charged with domestic assault, but the charge was subsequently dismissed. Father testified that a few days after the domestic assault charge, Mother had threatened to kill herself, picked up a knife, and put it to her wrist. Father testified that he contacted law enforcement, and Mother was arrested at that time. He testified that while he was not fearful that Mother was going to harm him, he thought she was going to hurt herself. That charge of domestic assault was dismissed.

In June 2014, Mother was arrested and charged with driving under the influence, failure to exercise due care, and violation of implied consent. According to Father, Mother was arrested for the driving under the influence charge after she wrecked a Jeep.

Father told her "[he] was done." Mother pled guilty to driving under the influence and the other charges were dismissed.

Father testified that he filed for divorce from Mother in August 2014. He and Mother entered into an agreed permanent parenting plan on August 28, 2014, while Mother was incarcerated. The parenting plan allowed Mother and Father equal parenting time. Father testified that the maternal grandmother ("Grandmother") assisted him in filling out the paperwork. He stated that Grandmother told him equal custody would be the "best case scenario." According to Father, he thought that he could believe what Grandmother told him because "she worked for a lawyer." The divorce between Mother and Father was finalized on December 17, 2014.

The agreed parenting plan allowed Mother and Father to have alternating weeks of parenting time with the Children. Father testified that although Mother and Father supposedly shared equal parenting time, Mother never had the Children for an entire week at a time. Mother would have the Children on the weekends at Grandmother's home, and Father would have them during the week. For Mother's parenting time on weekends, Grandmother would pick up the Children from Father's home every weekend. According to Father, Mother usually was not with Grandmother when she picked up the Children.

Father testified that he provided financially for the Children's needs, including clothing, food, babysitting, and school expenses, and that Mother did not provide any money to him for the Children. Father worked third shift until about a year prior to the September 2018 trial when he began working on day shift. When Father worked at night during his parenting time, Grandmother would care for the Children at night, and Father would pick up the Children from Grandmother's home in the morning after work. According to Father, Mother sometimes was at Grandmother's home when he picked up the Children, but she was not present most of the time.

Stepmother and Father had begun dating in February 2015. After Father and Stepmother moved in together in early March 2015, Stepmother began watching the Children at night while Father worked. Stepmother assisted Father with taking the Children to school. Father testified that Mother never assisted in taking Khloe to school and never attended any school events for which he was present.

In September 2015, Father hired an attorney and filed a "Motion to Modify Permanent Parenting Plan and for Ex Parte Restraining Order." Father and Mother subsequently attended mediation and agreed to a temporary parenting schedule, which decreased Mother's visitation from equal parenting time to weekend visitation. During this time, Mother received visitation with the Children at Grandmother's home each weekend except the third weekend of the month. In April 2016, Mother's contact with the Children was restricted to supervised visitation every other weekend with

- 4 -

Grandmother supervising Mother's visitation. The Children also were to have no contact with Mother's paramour, D.H. Father acknowledged that before Mother went to jail, she would visit with the Children sometimes but not every scheduled time.

The records presented to the Trial Court reflect that in June 2016, Mother's probation officer, Bethany Huening, filed an affidavit with the court alleging that Mother had violated the rules of her probation. Specifically, the allegations in the affidavit were that Mother had (1) admitted to the use of buprenorphine without a prescription on two occasions, (2) failed to complete treatment at Willow Ridge, and (3) failed to attend intensive outpatient classes at Watauga Behavioral Health. Mother was arrested on the violation of probation charge on July 5, 2016. Mother remained incarcerated through the filing of the petition until her release in March 2018. While incarcerated in February 2017, Mother failed a drug screen for amphetamines. She also failed a drug screen in September 2017 for buprenorphine while incarcerated.

Stepmother testified to her involvement with the Children during trial. Stepmother stated that she moved in with Father at the beginning of March 2015 and that they were married at the end of that month. According to Stepmother, she assisted Khloe in getting ready for school in the mornings, dropped Khloe off at school, and picked her up from school in the afternoons. She also took care of Madison during the day while Khloe was at school and Father was sleeping.

According to Stepmother, she attended a parent-teacher conference in March 2015 with Khloe's teacher, a field trip to The Bright's Zoo in May 2015, Honors Day, pre-K graduation for Khloe in May 2015, and a Valentine's Day party in 2016. Stepmother and Father had participated in an egg hunt and picnic at Khloe's school and a parent-teacher conference in March 2015. They also had attended registration day when Khloe began kindergarten in August 2015 and a Dr. Seuss field trip with the school. Father, Stepmother, and Grandmother were present for a Christmas program at school in December 2015 and for Khloe's kindergarten graduation in May 2016. According to Stepmother, Mother was not present at any of these events.

Stepmother testified that on Halloween in 2015, Mother was supposed to have the Children, but Mother was not present during that visit. Stepmother explained that Grandmother took the Children trick-or-treating without Mother. Stepmother stated that she does not recall Mother ever taking the Children to school or picking them up. According to Stepmother, Mother would be present once or twice at pickups immediately after a visitation order was put in place but that she had not been present most of the time. Stepmother testified that she had only seen her "a handful of times" in the four years she had been involved with Father and the Children. Stepmother further testified that Mother had not paid financial support for the Children since she had been with Father.

Stepmother explained that she had potty-trained Madison because she was still in diapers when Stepmother became involved in helping care for the Children. Madison also did not speak very well when Stepmother entered the picture. Stepmother testified that she worked with Madison to help her talk more and understand her better. Stepmother and Father also have two other children in the home, twin sons, who love the Children. Stepmother expressed that she and the Children have a strong bond and that they refer to her as "Mom."

Mother testified during trial and requested that the Trial Court decline to terminate her parental rights to the Children. Mother stated that after the Children were born, she had gotten up with them every night, fed them, clothed them, and bathed them. Mother testified that she stayed home with the Children while Father worked. During that time, Mother testified that she often would accompany Father when he took Khloe to school or would stay home with Madison if she was still asleep.

According to Mother, that began to change when she and Father separated. Mother began working at Burger King, did not have much money or a driver's license, and she had moved out of the home. Mother testified that it was difficult to talk to Father after they separated, especially once Stepmother became involved. According to Mother, she was supposed to receive equal parenting time and had tried to see the Children, but she had difficulty communicating with Father.

According to Mother, she visited with the Children between March 4, 2016 through July 4, 2016, every other weekend at Grandmother's home. Mother explained that she lived with Grandmother so she was present at the visits unless she had to work. Mother testified that she did not accompany Grandmother when she picked up and dropped off the Children due to the tension between the parents. According to Mother, she would see the Children while they were at Grandmother's home. Mother testified that while she was incarcerated, she sent two letters to Khloe and spoke with the Children via telephone. Mother explained that the agreed order restricting her time with the Children to only supervised visitation on weekends was based mainly on the individual she was dating at the time, D.H.

Mother testified that she had not been ordered to pay child support to Father and had financially supported the Children when they visited her by purchasing clothing, toys, and groceries. Mother testified that prior to her incarceration, she had a great relationship with the Children and saw them as much as she could.

Mother testified that she never was notified of any school activities so that she could attend them. When asked by the Trial Court why she did not attend the events with Grandmother when Grandmother was in attendance, Mother stated that she was not aware of the events until the last minute and that she would not attend events because of the tension between Mother, Father, and Stepmother. Mother testified that the main

- 6 -

reason she did not attend Khloe's kindergarten graduation was because of the tension between Mother, Father, and Stepmother.

Mother acknowledged that Madison was born drug addicted but stated that the doctors informed her that the Prozac she was taking "had a lot to do with it." Mother stated that she took Lortabs for her back during her pregnancy. Mother acknowledged failing a drug screen in 2015 but stated that she stopped using after she failed that drug screen.

Mother testified that she was incarcerated from July 5, 2016, through March 27, 2018. Mother stated that she had been arrested for violating her probation after she had failed drug screens. Mother stated that she had taken Suboxone "every now and then" from January to April 2016. According to Mother, she was "trying to get off pain pills." Mother acknowledged using Suboxone consistently and failing three drug screens in the months leading up to her July 2016 incarceration. Mother stated that she did not have a prescription for the Suboxone due to her inability to afford to go to a Suboxone clinic. Mother acknowledged failing drug screens while in prison, one in February 2017 for amphetamines and another in September 2017 for Suboxone.

At the time of trial, Mother had been released from her incarceration and was no longer on probation. Mother testified about efforts she had made to remedy her addiction. Mother testified that she went to Woodridge twice in 2015 for her addiction problems and her depression. She said it helped for a little while. According to Mother, she also went to Willow Ridge for a month.

Mother further testified that she entered a rehabilitation program the day she left jail for twenty-eight days and was released from that program in April 2018. Mother agreed to attend aftercare treatment and was referred to Watauga to attend meetings a few times a week. Mother testified that she recently had been attending Alcoholics Anonymous and Narcotics Anonymous meetings and continued appearing for those meetings when she could obtain transportation. Mother stated that she had attended two appointments at Watauga Behavioral Health and that she was going to reschedule an appointment that she missed due to work. Her first appointment at Watauga was in May 2018 and the second was in July 2018.

Mother testified that she had not completed any program to remedy her drug addiction. Mother acknowledged walking out of treatment at Woodridge due to an altercation with other individuals at the facility. Mother had attended intensive outpatient treatment but did not complete the program. According to Mother, she no longer associated with individuals who drink alcohol or use drugs, and she no longer had an urge to use them. Mother further testified that she decided to cease the medication for her depression because she "didn't like the way they made [her] feel." According to Mother,

she had informed her doctor that she was stopping her medication, and he instructed her to slowly stop the medication.

Mother is employed currently at Cranberries, a restaurant in Johnson City, and has been employed there since June 2018. Mother currently resides at Grandmother's home. Mother testified that she had not seen the Children since July 5, 2016, and had not spoken with the Children since November 2017. Mother acknowledged that her relationship with the Children was not very good at the time of trial.

Cathlyn C. Cannon testified as an expert witness in the area of family and individual mental health counseling. Ms. Cannot met the Children on two occasions. According to Ms. Cannon, Khloe told her that she was "required to call [Stepmother] Mommy, but that she also has a mommy that she doesn't see very often." Ms. Cannon stated that the Children informed her that they wished to see Mother and that Khloe told her she missed Mother. Grandmother provided Ms. Cannon with letters Khloe had written to Mother, but she did not speak to the Children about the letters. Ms. Cannon opined that it would be detrimental to the Children if Mother's rights were terminated. Ms. Cannon stated that this conclusion was based on the Children expressing interest in Mother and their awareness that they were involved with Mother when Grandmother was present. Ms. Cannon met with Mother, Grandmother, and the Children, but she did not meet with Father or Stepmother with the Children present.

Grandmother attended the exchanges for the Children instead of Mother "to keep them from arguing." Grandmother testified that Mother gave her money, helped with groceries, and bought clothes and toys for the Children when they were in her home. Grandmother testified that Mother visited with the Children while they were in her home on weekends until Mother was incarcerated. From March 2016 until her incarceration in July 2016, Mother lived with Grandmother half of the time and stayed with her boyfriend, D.H., half of the time. Mother came to her home to visit with the Children during this time.

Grandmother stated that Mother's visitation was restricted to supervised because Mother was dating D.H. and "because of his felony records." Grandmother testified that she did not believe Mother was still dating D.H. However, Grandmother identified D.H. and Mother in a photograph from September 7, 2018, at a movie theater. Grandmother testified that Mother had been "really trying" and that she had seen a different side of Mother. However, Grandmother stated that she was "very disappointed" after seeing the photograph of Mother and D.H. because D.H. is "not good, he's not good for anybody."

Khloe testified that she calls Stepmother "Mama," but that she was unsure what to call Mother "because she hasn't really been in our life a lot." Khloe said she had not seen Mother in a long time. According to Khloe, Mother never took her shopping or purchased anything for her, but Grandmother did those things. When Khloe was asked if

anyone had told her to say anything she did not wish to say, she responded that Grandmother told that that if she was nervous at court, to "tell the Judge that you want [Grandmother]." Khloe denied that Father or Stepmother had ever told her to say anything she did not want to say or instructed her to tell the trial judge anything. Khloe testified that Stepmother had "been there for us when a mom wasn't there for us."

According to Khloe, Grandmother used to yell at her when she was on her tablet if Grandmother was wanting her to look at photographs of Mother and Father from when they were in a relationship. Khloe stated that Grandmother told her that Father was "never there for us." Khloe testified that Grandmother also told her she should not call Stepmother "Mama" because "she's not your mama." According to Khloe, Grandmother had instructed her to write letters and pictures for Mother when Mother was in jail but that Khloe "didn't really do it." Khloe testified that she did not wish to see Mother because she had not been around for them and "it's uncomfortable."

Following trial, the Trial Court took the matter under advisement. On December 3, 2018, the Trial Court entered its judgment, terminating Mother's parental rights on the sole ground of wanton disregard. In its judgment, the Trial Court found by clear and convincing evidence that Mother had abandoned the Children through her actions exhibiting wanton disregard for their welfare and that termination of her parental rights was in the Children's best interest. Mother timely appealed the Trial Court's judgment to this Court.

## **Discussion**

Although not stated exactly as such, Mother raises two issues on appeal: (1) Whether the Trial Court erred by finding by clear and convincing evidence that Mother had abandoned the Children through her actions constituting wanton disregard for the Children's welfare and (2) Whether the Trial Court erred by finding by clear and convincing evidence that termination of Mother's parental rights was in the best interest of the Children.

With regard to the termination of parental rights, our Supreme Court has instructed:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[2] *Troxel v.*

---

[2] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life,

*Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S. Ct. 1388, 71 L. Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S. Ct. 1388. ["]Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S. Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S. Ct. 555, 136 L. Ed.2d 473 (1996). The parental rights at stake are ["]far more precious than any property right." *Santosky*, 455 U.S. at 758-59 102 S. Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759, 102 S. Ct. 1388 (recognizing that a decision terminating parental rights is ["]*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to ["]fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S. Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S. Ct. 2153, 68 L. Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated ["]fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S. Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). ["]Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted).

---

liberty or property, but by the judgment of his peers or the law of the land."

The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1[-]113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
>
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[3] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[4] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the

---

[3] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[4] Tenn. Code Ann. § 36-1-113(i).

hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1113[sic](k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n.15 (Tenn. Ct. App. 2007)).

## B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

- 12 -

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered).

Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Our Supreme Court, however, has instructed "that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525-26 (footnote omitted). As such, we review each of the grounds for termination.

Only one ground for termination is implicated in this appeal. As pertinent, Tennessee Code Annotated § 36-1-113(g)(1) provides:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

We first address whether the Trial Court erred by finding the ground of abandonment by wanton disregard against Mother. Initially, we note that Petitioners had not included the statutory ground of abandonment through wanton disregard in their termination petition. However, Mother's attorney acknowledged at the beginning of trial that although it was unclear whether that particular ground was pled in the petition, Mother was prepared to defend against that ground during trial. Mother's attorney further informed the Trial Court in the middle of trial that Mother was not objecting to the consideration of this statutory ground. In this case, it is clear from the record, Mother had prior notice that Petitioners were seeking to terminate her parental rights based on this statutory ground and agreed, through her attorney, to that ground being tried. We, therefore, determine that the statutory ground of abandonment through wanton disregard was tried with the express consent of Mother. *See* Tenn. R. Civ. P. 15.02 ("When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."). Therefore, we will proceed to address Mother's arguments on appeal.

Regarding wanton disregard, Tennessee Code Annotated § 36-1-102 provides:

- 13 -

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

* * *

(iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and . . . the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

Mother had been incarcerated since July 5, 2016. It is uncontested that Mother was incarcerated during the entire four months preceding the termination petition. We then must examine whether Mother's actions prior to her incarceration exhibited wanton disregard for the Children's welfare.

Mother contends on appeal that the Trial Court erred by considering Mother's actions prior to the finalization of Mother's and Father's divorce, asserting that those facts could have been considered during the divorce proceedings and cannot be relitigated in the subsequent termination action. During oral arguments, Mother's counsel specifically stated that res judicata and collateral estoppel would apply in the termination proceedings.

Mother cites to *In re Johnathan M.*, No. M2018-00509-COA-R3-PT, 2019 WL 126995 (Tenn. Ct. App. Jan. 8, 2019), *perm. app. denied* (Tenn. Apr. 2, 2019), to support her argument that the Trial Court should have considered only Mother's actions that occurred following the divorce action. The Court in *In re Johnathan M.* does not appear to have considered the issue Mother is raising regarding the Trial Court's consideration of events occurring prior to the parties' divorce. The parties in *In re Johnathan M.* divorced in November 2011. *Id.* at *1. The majority of the listed criminal activity by the parent occurred beginning in June 2012, which occurred after the parties' divorce. *See id.* at *1-2. The court looked at a shoplifting charge that occurred in 2011, but the appellate court noted that the date of the incident was not in the record on appeal. *See id.* at *1. Because only the year of the incident is known, it is unclear whether the 2011 arrest for shoplifting occurred during the marriage or after the divorce in November 2011. The appellate court's only conclusions pertaining to the shoplifting charge is that the record did not support the trial court's finding that Mother had involved the child during the shoplifting incident or that the incident caused the child's issues in school. *In re Johnathan M.* does not support Mother's contention that the Trial Court erred by considering facts that had occurred prior to the finality of the parties' divorce.

- 14 -

Our Supreme Court in *In re Taylor B.W.*, 397 S.W.3d 105 (Tenn. 2013), addressed a similar situation, determining that res judicata and collateral estoppel did not apply to a subsequent termination of parental rights action following a previous custody and grandparent visitation action. In *In re Taylor B.W.*, the parents of the children entered into a marital dissolution agreement and parenting plan during their divorce proceeding. *Id.* at 106. Following the divorce, the mother incurred criminal charges which resulted in her incarceration. *Id.* The parents then entered into an agreed parenting plan that reflected the mother's incarceration, granted the maternal grandmother grandparent visitation with the children, and allowed for recommencement of the original parenting plan upon the mother's release from jail. *Id.* While the mother was incarcerated, the father married the stepmother and ultimately filed for termination of the mother's parental rights to the children. *Id.* The trial court found that res judicata did not apply to the termination action. *Id.* at 111. The mother appealed to the Tennessee Court of Appeals and ultimately to the Tennessee Supreme Court. *Id.* at 110-11.

On appeal, the parties in *In re Taylor B.W.* agreed that a ground existed for termination of the mother's rights and the only issue was whether termination of the mother's rights was in the children's best interest. *Id.* at 111. The mother argued that the parties' agreed order amending the parenting plan estopped the father and stepmother from asserting that termination of the mother's parental rights was in the children's best interest. *Id.* The Court explained as follows regarding res judicata and collateral estoppel:

> The doctrine of res judicata prevents a suit between the same parties or their privies on the same cause of action with respect to issues that could have been litigated in a prior suit. *Creech v. Addington*, 281 S.W.3d 363, 376 (Tenn. 2009). The cause of action in this suit involves the termination of Mother's parental rights. The prior litigation between Mother and Father involved their divorce, a parenting plan for the children, and grandparent visitation. The causes of action in the two cases are different, and therefore res judicata does not prevent consideration of the parental termination action.
>
> As we stated in *Clark v. Sputniks, LLC*, collateral estoppel is an extension of the principle of res judicata and only applies in a suit in which the issue involved has already been litigated in a prior suit by the same parties. 368 S.W.3d 431, 437 (Tenn. 2012) (quoting *Home Ins. Co. v. Leinart*, 698 S.W.2d 335, 336 (Tenn. 1985)). The factors for determination of the best interest of a child depend on the type of action before the court. *See In re Audrey S.*, 182 S.W.3d 838, 878 n.52 (Tenn. Ct. App. 2005). The best-interest determination in a parental termination action is governed by the nine non-exclusive factors in Tennessee Code Annotated section 36-1-113(i). A modification of a parenting plan and grant of grandparent

visitation, however, are governed by the sets of factors in Tennessee Code Annotated sections 36-6-106(a) (2010) (child custody) and 36-6-307 (2010) (grandparent visitation).

> The determination of the best interests of [the children] in the present parental termination proceeding requires consideration of a different set of factors than those that were considered in the prior custody and grandparent visitation proceeding. Each determination therefore requires the issue of "best interest" to be decided using a different set of factors. The doctrine of collateral estoppel is therefore inapplicable because the issues are not identical. *Mullins v. State*, 294 S.W.3d 529, 536 (Tenn. 2009) (citing *Patton v. Estate of Upchurch*, 242 S.W.3d 781, 787 (Tenn. Ct. App. 2007)).

*Id.* at 111-12.

The issue raised by Mother in the present case is somewhat different from *In re Taylor B.W.*, in that Mother seeks to prevent the Trial Court from considering Mother's criminal actions during the marriage as relevant to the ground of abandonment through wanton disregard, instead of the best interest analysis. Specifically, Mother argues that the Trial Court erred by considering three of Mother's arrests and convictions (i.e. theft, aggravated assault, and DUI) in its analysis regarding abandonment by wanton disregard because Mother's actions regarding those criminal convictions occurred prior to entry of the parties' divorce decree. We disagree with Mother's contention.

In her brief, Mother essentially argues that Father acquiesced in Mother's bad behavior and, therefore, cannot use that behavior against her in the termination proceeding. We emphasize that this termination of parental rights proceeding is an action concerning the Children, not Father, even though Father is a petitioner in the action.

Applying the same logic utilized in *In re Taylor B.W.*, the prior litigation between Mother and Father during the divorce action, wherein an agreed parenting plan was entered and approved by the Trial Court, is a different cause of action than the subsequent parental termination proceeding and does not contain the same issues as were previously adjudicated. Thus, neither res judicata nor collateral estoppel would apply to the termination action. As such, the Trial Court did not err by considering Mother's actions that had transpired prior to and during the divorce proceedings.

Mother further avers that the Trial Court erred by considering two failed drug screens during her incarceration to establish that Mother abandoned the Children through wanton disregard. We agree with Mother that her conduct that occurred during incarceration cannot be relied upon as to the statutory ground of abandonment through wanton disregard because it was not "conduct prior to incarceration . . ." as required by

the statute. *See In re Johnathan*, 2019 WL 126995, at *5 (determining conduct during incarceration cannot be the basis for termination of parental rights on the ground of abandonment through wanton disregard). However, upon a review of the Trial Court's judgment, the Trial Court did not rely on Mother's actions of failing drug screens during her incarceration when determining that clear and convincing evidence existed to support the ground of abandonment through wanton disregard. The Trial Court specifically focused on Mother's actions of engaging in theft, committing aggravated assault, driving and wrecking a Jeep while under the influence, and her involvement with D.H. We find no error with the Trial Court's consideration of these acts by Mother that occurred prior to her incarceration.

Additionally, Mother further avers that the Trial Court erred by failing to find that "redeeming factors" were present when it determined that her actions exhibited wanton disregard for the Children's welfare. Mother argues that she had cared for the Children during the marriage, "spent some time at" Woodridge for treatment, attended appointments with Watauga Behavior Health, attended NA/AA meetings since her release from jail, maintained employment, and continued to reside with Grandmother. Mother claims that with her "redeeming factors," Petitioners had failed to prove by clear and convincing evidence that Mother had abandoned the Children through her actions constituting wanton disregard of the Children. We note that the NA/AA meetings Mother testified that she attended occurred after Mother's incarceration. Even considering these "redeeming factors," the evidence does not preponderate against the Trial Court's finding that Mother's actions prior to her incarceration exhibited wanton disregard for the Children's welfare by clear and convincing evidence.

Mother acknowledged using drugs without a prescription in the months prior to her July 2016 incarceration. Although Mother was restricted to supervised visitation in part due to her relationship with D.H., Mother stayed with D.H. and agreed to the supervised visitation. Mother was arrested and convicted of theft under $500; driving under the influence, which had resulted in an automobile accident; aggravated assault; and two violations of probation. All of those actions by Mother occurred prior to her incarceration in July 2016. We find, as did the Trial Court, that Mother's actions prior to her July 2016 incarceration exhibited wanton disregard for the Children's welfare. We, therefore, affirm the Trial Court's finding that the ground of abandonment by wanton disregard was established by clear and convincing evidence.

Having determined that a ground exists for the termination of Mother's parental rights, we next address the best interest analysis. Mother contends that the Trial Court erred by finding that termination of her parental rights was in the Children's best interest. Tennessee Code Annotated § 36-1-113(i) provides a set of non-exclusive factors courts are to consider in determining whether termination of parental rights is in a child's best interest:

(i)     In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following

(1)     Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)     Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)     Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)     Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (2017).

With regard to making a determination concerning a child's best interest, our Supreme Court has instructed:

> When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. *In re Carrington H.*, 483 S.W.3d at 523 (citing *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id.* When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id.* "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).
>
> Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the

- 19 -

circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

Mother contends that the Trial Court erred by finding that termination of her parental rights was in the best interest of the Children. Specifically, Mother contends that the trial court erred in its weighing of the totality of the best interest factors for consideration and had made contradictory findings of fact regarding the best interest analysis. We disagree.

The Trial Court addressed each statutory factor contained in Tennessee Code Annotated § 36-1-113(i) separately and concluded that in totality the factors weighed in favor of terminating Mother's parental rights to the Children. As to factor (1), the Trial Court found that Mother had failed two drug screens while she was incarcerated. Mother failed one drug screen in February 2017 for amphetamines and another drug screen in September 2017 for buprenorphine. Although those drug screens could not be used to support the statutory ground of abandonment through wanton disregard by Mother because it occurred during her incarceration, the Trial Court properly considered the drug screens for purposes of the best interest analysis.

The Trial Court found that Mother's actions had improved since her release from jail but that "warning signs" had arisen. Specifically, the Trial Court found that Mother had rekindled her relationship with the boyfriend, D.H., that had caused her visitation with the Children to be restricted to supervised, that she had made only "half-hearted efforts" to attend counseling, and that she had ceased her medication for depression. As the Trial Court concluded, those actions by Mother demonstrated that Mother was not "truly interested in reforming her conduct." As such, the Trial Court found that this factor weighed in favor of the termination of Mother's parental rights.

The Trial Court determined that factor (2) was not relevant to the present case. Regarding factor (3), the Trial Court recognized that Mother maintained a relationship with the Children prior to her incarceration in July 2016. Although Mother failed to utilize all the parenting time she was allowed under the custody agreement, Mother did visit the Children regularly on weekends. The Trial Court found that this factor weighed against the termination of Mother's rights.

The Trial Court placed significant emphasis on factor (4) regarding Mother's relationship with the Children, determining this factor to be "without question, the most significant best interest factor in this case." As the Trial Court found, Mother's relationship with the Children has become tenuous since they had not visited with Mother

since her incarceration in July 2016. The Children now consider Stepmother as their mother. Khloe knows that Mother is her biological mother but her relationship with Mother is not close. The Trial Court recognized that the relationship between Khloe and Mother was "certainly not approaching a parent-child relationship." Khloe testified during trial she calls Stepmother "Mama" and that Mother had not been in the Children's lives very much. According to the Trial Court, the lack of a meaningful relationship between Mother and the Children predated Mother's incarceration and began after her separation from Father. The Trial Court found that after her separation from Father, Mother had been "an occasional presence" in the Children's lives as Grandmother exercised parenting time with the Children. The Trial Court specifically found that Mother had "outsourced" her parenting duties to Grandmother.

Additionally, Mother was unavailable to parent the Children while she was incarcerated from July 2016 through March 2018 and during her post-incarceration rehabilitation program in April 2018. The Trial Court found that the lack of a meaningful relationship between the Children and Mother was Mother's fault. The Trial Court also noted that Mother's action of rekindling her relationship with her "'bad news' boyfriend" since her incarceration indicated Mother was not reformed since he had been the reason her contact with the Children was restricted to supervised visitation. According to the Trial Court, this demonstrated that Mother remained "uncommitted to developing a true mother-children relationship." The Trial Court therefore determined that this factor weighed in favor of the termination of Mother's parental rights.

Concerning factor (5), the Trial Court found that no persuasive evidence was presented to demonstrate that the Children would suffer emotional, psychological, or medical harm if the Children were placed in Mother's custody. However, the Trial Court noted that the "true problem" was Mother's unwillingness to actually become a primary caretaker to the Children. Nonetheless, the Trial Court found that this factor weighed against the termination of Mother's parental rights.

As to factor (6), the Trial Court found that Mother had not shown any brutality, physical, sexual, emotional or psychological abuse, or neglect toward either of the Children. As such, this factor favored a continuation of Mother's parental relationship with the Children.

Pursuant to factor (7), the Trial Court found that no evidence was presented of criminal activity or substance abuse in Grandmother's home where Mother lived. In fact, the Trial Court specifically found that Grandmother's home was safe and appropriate. The Trial Court, however, noted that Mother's drug use had affected her ability to parent the Children. Mother was incarcerated due to a violation of probation resulting from her drug use, but Petitioners presented no evidence to prove that Mother had parented the Children while high on drugs or alcohol. Consequently, the Trial Court found that this factor weighed against the termination of Mother's parental rights.

Regarding factor (8), the Trial Court found that Mother unilaterally had chosen to discontinue her depression medication and had provided no medical evidence or expert testimony to support her decision. The Trial Court described Mother's testimony in court to be "monotone" and her demeanor to be "somber" but concluded that those observations alone were insufficient to determine that Mother was emotionally unstable. However, the Trial Court found that in combination, Mother's "demeanor in the Courtroom, her past practice of letting her mother care for the Children, her discontinuing of depression medicine, her disinterest in counseling, and her rekindling of a bad romantic relationship" had demonstrated that Mother is unable or unwilling to provide stable care for the Children. The Trial Court recognized that this situation Mother created had resulted from Mother's "detached emotional connection to [the] Children." Therefore, the Trial Court found that this factor weighed in favor of the termination of Mother's parental rights to the Children.

The Trial Court found that factor (9) did not weigh in favor of or against the termination of Mother's parental rights because the parents had agreed that Mother would not pay Father child support. After weighing all the factors contained in Tennessee Code Annotated § 36-1-113(i), the Trial Court found that the termination of Mother's parental rights to the Children was in the best interest of the Children.

Upon a review of the record on appeal, we determine that the evidence presented does not preponderate against the Trial Court's findings relevant to whether termination of Mother's parental rights was in the best interest of the Children and that the combined weight of those facts satisfies the clear and convincing standard. Therefore, we affirm the Trial Court's judgment terminating Mother's parental rights in its entirety.

## **Conclusion**

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs assessed below. The costs on appeal are assessed against the appellant, Kristen B., and her surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE